The next case for oral argument this morning is Fourqurean v. NCAA, appeal number 25-1187. Good morning, your honors, and may it please the court, Rakesh Gillaru for the NCAA. Good morning. The question in this case is whether the antitrust laws allow the educational institutions that compose the NCAA to establish and maintain eligibility rules, providing that college sports are played by college students seeking a college degree. Every circuit to address that question has concluded that the answer is yes, including this court in both Banks and ACNU. In concluding otherwise, the district court did not just ignore this raft of circuit authority, it also misapplied the antitrust laws by reducing the plaintiff's burden of obtaining a preliminary injunction, a mandatory preliminary injunction to nothing, and also ignoring how the Supreme Court has dictated that the antitrust law should be applied under the rule of reason. I think if I could start with the context of this case, it's important. The plaintiff was seeking a mandatory preliminary injunction, which is an injunction requiring an affirmative status quo changing act by the NCAA. And as this court has made clear in May's, those types of injunctions are to be cautiously viewed and sparingly issued. So that's the ground level that we were looking at in approaching this case from the beginning. And in order to show that the plaintiff should get that extraordinary form of relief, he had to show some likelihood of success on the merits as well as a reprimand. We think the district court erred in both of those findings, but I'll focus, if I could, first on the merits. The circuit consensus today is that eligibility rules are consistent with the antitrust laws. Start with this court's decision. Is your argument that eligibility rules are categorically valid under Section 1? I think we've made that argument in other contexts, Your Honor. I'm asking if that's your argument here, and if so, how would you square that with Ohio versus NCAA in the transfer eligibility rules? I think a few responses to that, if I could, Your Honor. We haven't presented that specific argument here because of Agnew. We have presented that argument in other circuits where we don't think the argument is foreclosed. I think what Agnew says in this circuit is that eligibility rules are, at minimum, presumptively pro-competitive. That was the ruling in Banks. That was also the ruling in Agnew. So to start with Banks at 1089, the court, Seventh Circuit, took the position that a challenge to the 4 over 5 rule, which is what is at issue here, would be quote-unquote absurd. You then follow that with Agnew where the court says that eligibility rules are presumptively pro-competitive and grants a motion to dismiss a case, which I think is consistent with that very finding. So then the question is, has anything changed since then that should disrupt the consensus not just of Agnew and Banks, but also all the other circuits to look at this? The Third Circuit in Smith, the Fifth Circuit in McCormick, the Sixth Circuit in multiple decisions, and the Ninth Circuit in O'Bannon. And the answer to that question is no. I think the clearest indication of that comes. You don't think that some of the reliance on amateurism in those cases, you don't think anything has changed in regards to that? Whether or not the reliance on amateurism has changed, the bottom line legal ruling regarding the pro-competitive nature of the rules has not. And on that, I would urge the court to look at the Alston decision, specifically page 90, because in that decision, which said that as a general matter the NCA's rules are subject to the antitrust laws, the court said that there are some rules that are going to be so presumptively pro-competitive that they can be upheld in the twinkling of an eye. But it didn't exclude all eligibility rules. I think that's a pretty broad argument to make and one you don't need to hear. Yeah. As I said, Your Honor, I don't think we're pressing that specific argument here. I think what we're asking the court to do is read the passage in Agnew, which said that eligibility rules fall comfortably within the presumption of pro-competitiveness afforded to certain NCA regulations. That's at 343. And then to put that up against the passage in Alston that says effectively the same thing, which is, and this is at 90, even a sports league with market power might see some agreements among its members with antitrust approval in the twinkling of an eye upheld. There's no daylight between those two things, and eligibility rules fall well within that ambit. What is the pro-competitive justification for eligibility rules? There are a few, Your Honor. I would note, if I could, not to push back on the question, you only get to that if the plaintiff can prove an anti-competitive effects, which I'd address. There are several, Your Honor. The first is product differentiation. So ensuring that college sports are played by college athletes is the differentiating factor between college and professional sports, and eligibility rules further that objective by saying that you need to be a student at a school pursuing a degree for the rough period of time it takes people to pursue a degree. The rules also protect output and increase opportunity. By having an orderly progression of students getting to compete in college sports and moving on, it opens the door for future student athletes to get those opportunities. Every time someone stays for a fifth or a sixth or a seventh. How does all of that square with the new portal situation? I don't think it's at all inconsistent with the portal situation, Your Honor. The portal operates in the context of the eligibility rules, so people who have eligibility can transfer, but the portal doesn't create additional eligibility or expand eligibility. It simply says that people can do their four years over five years at different schools depending on their individual circumstances. But the overall concept of eligibility of five years to complete four years is unchanged by the portal. It certainly impacts the situation with degree progression, doesn't it? It may. It may not. I think, again, the transfer issue is one where students make individual decisions about why they want to transfer, and some may transfer for predominantly athletic reasons. Some may transfer because they want a different educational and athletic experience. But I think the relevant question for these purposes is not how the transfer portal affects the eligibility rules, but whether the eligibility rules are valid under the antitrust laws and whether the district court applied a sound antitrust analysis in invalidating the rule. Your time is running short, and I'd also like you to, at some point, address, if we're not, if we see some of your arguments and don't think that the district court came to the right conclusions regarding the strength of the case and some of the antitrust analysis, perhaps we don't agree with, we still have this pretty significant irreparable harm, right? I mean, the draft's come and gone, season's coming up. How do we weigh that? If I could, Your Honor, I guess I would say a couple things on that. To start with the irreparable harm question, I don't think Petitioner has actually shown irreparable harm under this court's precedence, both because of the delay in raising the issue. The issue of his 2021 season counting towards his eligibility clock was apparent in 2021. This lawsuit wasn't brought until December of 2024. And second, the harm that's alleged is both speculative and one that is largely redressable by money, which is the apparent lost earnings that will be found. But I think in order to obtain a mandatory injunction, just to sort of end where I began for the first portion of the argument, the Petitioner doesn't just have to show a likelihood of irreparable harm. They also have to show some likelihood of success on the merits. And only if you clear both of those do you get into any kind of balancing inquiry. And here the district court did not properly evaluate the relevant market. In fact, it didn't ask the plaintiff for any proof whatsoever on that issue. It did not find and make any valid finding of harm in an antitrust market. There's no finding whatsoever of reduced output or reduced prices, which is what you would typically see in an antitrust case. And then the remedy ordered is the exact type of micromanagement that Alston forbids and that it's not a remedy to quote that's likely to be effective where judges are likely to be an effective day-to-day enforcer. And it's also a remedy that cannot be explained or reasonably described to someone as to how to apply it in the future. So, again, that comes straight from Alston. Going back to your point about damages, are damages really a feasible remedy here? He's denied the possibility of playing this next year, therefore has to take his chances, I guess, with the pros now or never. How do you figure out what the damages are of having to do that? It seems an awfully speculative enterprise. Your Honor, our position on that may change if the litigation were to continue, but I would just note that in the context of other lawsuits that have been brought against the NCA, this exact type of damages argument, a lost NIL opportunity, a lost opportunity to compete, have been adjudicated. There's been a litigation over whether the damages can or cannot be measured. I suppose you could make the same argument about irreparable injury, couldn't you? Other than that, it would be speculative that there would be any injury. I think that's right, Your Honor. The question is just whether there's first the question of the harm, and then there's a separate question of the delay in bringing it, and all of that is only one step of the two hurdles that needed to be cleared here. I reserve what little time I have left. We'll give you a little bit more. Thanks, Your Honor. Thank you. Mr. Crooks? Thank you. May it please the Court. Mike Crooks on behalf of NYSEER Forcorrent. I compliment Judge St. Eve on your pronunciation initially. It took me a while to get it. I want to start by talking about the actual reality of the situation as opposed to what the law was 5, 10, 15 years ago. Banks is a 1992 case. Agnew is a 2012 case. Both of those cases predated Alston. As I believe all the judges now appreciate, Alston changed the landscape with respect to what rules are now violative or potentially violative of the Sherman Act. But what does the record show us with respect to those changes? I'm sorry, Your Honor? What does the record show with respect to the changes that have happened recently? As to what the economic impact of them has been? Well, you can look to a variety of different sources. You can look to the media and the reports that are out there. The hundreds of thousands, even millions of dollars, which are now being paid in NIL situations. My client testified at the hearing that hundreds of thousands of dollars were at stake for him alone. And I want to make clear that while banks and Agnew may have been the law until Alston, things have changed and rapidly so. But I don't think Alston changed that. Alston dealt with compensation rules. Here we have eligibility rules. And I want to make sure I understand what your theory is, please, Mr. Cooks. Are you arguing that there's a per se violation here? There is not a per se violation. Okay. What is your theory then as to the antitrust violation? Because if you aren't arguing per se, we have to look at rule of reason. Correct. So you agree that's what applies here, the rule of reason? I do. And that's what the district court applied. And what is your theory then under Section 1 as to the anti-competitive effects? So the Sherman Act prohibits rules which restrain trade. In this particular case, the fact that the eligibility rules have now been deemed to be commercial in nature by a variety of different courts, most recently the ELAD court, in which the NCAA's own expert, economist Fry, admitted on the stand that the eligibility rules are now commercial in nature. Are you saying he's being foreclosed from this market? Is that your argument? Yes. Then don't you have to define the relevant market? We have defined the relevant market. You've taken what they used in Allstead, but I don't see any development here of what the market is here. And why don't you tell me what you think the relevant market is here? I think it is D1 athletes with a subset being D1 football. And if the court looks to Paragraph 12, Paragraph 26, Paragraph 30. What's your evidence of the relevant market? I'm telling you, Your Honor, right now. I think you're identifying what's in the complaint. What evidence did you put in at the hearing? Well, if you look at the transcript of the argument, I was just about to put in evidence, and Judge Conley said we do not need to spend time establishing the market. The market has been established by Allstead, and it's pretty clear that it's D1 football. And going back to the Elad case, again, the NCAA's own economist, Fry, acknowledged that D1 athletes, D1 football was the relevant market. It is the only market. But this is a different case, so I'm not sure you can rely on that. And if your argument is that the relevant market here is men's Division I NCAA football players, how do you reconcile that definition with your allegation in the complaint that your client could play for the NFL? Because it seems like the NFL and the NCAA could be substitutes for him based on your own allegations. Whether my client can play in the NFL is unknown. Well, you've alleged that he could. So shouldn't the relevant market include the NFL then? No, because the NCAA doesn't police the NFL. I understand, but if you're making allegations that he could play in the NFL and he has a substitute market to go to, it seems like that's relevant to the market definition here. He may have the substitute market to go to. We hope he eventually gets there. One more year at Division I would give him a better opportunity to ultimately get there. But that's not a substitute market, Your Honor. It's a different market. It's a professional market. Now, admittedly, this NCAA Division I football is moving rapidly in that direction when you see some of the dollars that we're dealing with. What's the limiting principle to your argument? Say your client wanted to play another three years and says, well, if I have three more years of college play and I can make all this money under NLI and I'll become a better player and I have a better chance of getting drafted after three more years. A fair question. And we argued initially to the district court that D2 time shouldn't count at all because of the inability to earn NIL money. So what's the limit? What's your limiting principle here? Because it seems to me under your argument you could have somebody graduating from college and saying, oh, I'm going to go to law school, and for those three years I want to keep playing. So I want seven total years of eligibility. And it's an antitrust violation not to let me play those full seven years. Where do we draw the line? We're not saying that eligibility rules aren't fair and that there shouldn't be. We're fine with the five-year rule if it's meaningfully applied, if exceptions to that rule are available to athletes on a basis that makes sense. I think what troubled Judge Conley and what troubled us was there are not meaningful exceptions. There are some exceptions. The meaningful exceptions under the antitrust law have to do with competition, not meaningful exceptions for the benefit of an individual student or what might seem fair to an individual student. They have to be grounded in competition. Correct, and the market as a whole. And we're not arguing that the meaningful eligibility exceptions should apply only to Mr. Forkerin. We're also arguing that they should apply on a broader scale to other student athletes who face similar situations like my client faced in this particular case. But there's no evidence of those other athletes. This seems individualized, which isn't what we're supposed to be looking at in antitrust. Well, Judge Collard, to be fair, we haven't had an opportunity to do discovery yet. And as I'm sure you can imagine, the NCAA didn't send me a packet of other waiver denials where they indicated, well, these folks are similar. See what we did in these cases. We have no reason to doubt that we're going to be able to develop that evidence. We just haven't had the opportunity at this point. So back to what we're really looking at here. We're looking at the court to say and affirm what the district court said, which is in order to not violate the Sherman Act, what we need is meaningful exceptions to the eligibility rules now that they have become commercial in nature. And we're not asking the court to throw out the eligibility rules in their entirety. We're asking the court to affirm what Judge Conley thought was necessary, and that is meaningful exceptions. And we think the court can get there in this case by focusing on the progression of cases from Alston to Ohio to Tennessee to now ELAD. If you review those cases as a whole, you can see how the market is progressing and how it's opening up for student athletes, and as a result they deserve the ability to be able to explore and receive meaningful exceptions when they are available. Thank you, Mr. Crooks. Thank you. Mr. Carver, we'll give you one minute for rebuttal. Thanks, Your Honors. I would just focus on the question about what evidence you have in the record for purposes of deciding this appeal. Petitioner's argument seems to be, or excuse me, Respondent's argument seems to be that Alston changed the world. But if that's so, then you need to look at the actual evidence in the record about what that world is. There is literally no economic evidence from the plaintiffs supporting their petition in this case. I am not aware of any antitrust case that has found a relevant market established for the plaintiff when the only evidence came from the defense's economist saying that they're wrong about the market. And that's what you have here. We're also not aware of any antitrust case finding anti-competitive harm where the only harm alleged is due a particular individual competitor as opposed to competition more generally. No proof in this case of an adverse effect on price. No proof in this case of an adverse effect on output. And then if you look at the remedy, saying that there should be meaningful exceptions is in no way an administrable remedy in the way that Alston clearly indicates there must be. If there's no further questions, we'd ask that the judgment be reversed. Thank you. Thank you. Court will take the case under advisement.